MORTIMER DANIEL LIEBERMAN, an Infant, by MAY LIEBERMAN, his Guardian ad Litem, Appellant, *v.* SHEFFIELD FARMS — SLAWSON DECKER CO., INC., Respondent.

(Supreme Court, Appellate Term, Second Department, December, 1921.)

Warranty — sale of bottled milk — implied warranty that milk is fit for human consumption — distributor held liable for illness of child caused by worms in milk.

Upon a sale of milk to be used as food there is an implied warranty of its fitness for human consumption even though the seller is merely a distributor of the product.

*Race* v. *Krum,* 222 N. Y. 410, followed.

The mother of plaintiff having bought of defendant a standard quart bottle of " Certified Milk " which was produced at the Wilmarth Farms, Kingsley, Penn., and sealed in conformity with the standards of the Kings County Medical Society, added boiled water to a portion of the milk for the use of plaintiff who was then eighteen months old and who toward evening on the same day became ill. An examination by the child's father showed small worms attached to the inside of the glass bottle and the remainder of the milk was kept and delivered by the guardians of the child to their family physician. In an action for negligence the complaint alleged *inter alia* that the illness of the child was due to the carelessness, recklessness and negligence of the defendant in the preparation of the milk and without contributory negligence on the part of the infant plaintiff or that of his guardian *ad litem,* and further, that the milk was unfit for human consumption and contained worms which caused the infant plaintiff to become ill. The family physician's diagnosis was gastrointeritis or inflamed condition of the stomach and intestines, and he testified that the inner surface of the bottle was saturated with little organisms or worms and that the nearest thing he could compare them with was " dragon fly larvae," and he also testified that the presence of these organisms in the milk was a competent producing cause of the child's illness.

The physician who was authorized by the Kings County Medical Society to pass upon the milk produced at the Wil-

marth Farms testified that, on one occasion, four years prior to the one in question, worms were present in the milk and indicated that these worms came from a reservoir used for the storage of water; that the worms had gotten into the reservoir from the surface, and that the water was used to wash the rims of the bottles and in that way the worms got into the bottle. It also appeared that the bottles and the caps which sealed them were furnished by the defendant, who was merely the distributor of the milk, but that the actual bottling and sealing thereof was done at the Wilmarth Farms, and that no employees of the defendant were employed there nor was any employee of defendant engaged in the bottling process. The trial justice after granting plaintiff's motion to amend the complaint to conform to the proof so as to claim to recover upon the theory of an implied warranty in the sale of the milk, and in the mistaken belief that such was the only cause of action, dismissed the complaint upon the merits. Upon reversing the judgment entered in favor of defendant and ordering a new trial, *held,* that the mere purchase of the milk made known to defendant that it was required for food; that as any one reading the printed matter on the label, " Sheffield Farms Co., Inc., Bottled at Wilmarth Farms," might well assume that the milk was the product of defendant's farm, the plaintiff had a right to assume that defendant had the opportunity to examine the milk.

APPEAL by plaintiff from a judgment of the Municipal Court of the city of New York, borough of Brooklyn, fourth district, in favor of defendant and dismissing plaintiff's complaint on the merits.

Emanuel Sustick, for appellant.

Arthur J. Peck, for respondent.

KELBY, J. On the 23d of August, 1919, the plaintiff's mother and present guardian *ad litem* bought from the defendant a quart bottle of "Certified Milk." This milk was for the use of the infant plaintiff, who was then eighteen months old. The certified milk was contained in a standard quart milk bottle and had

embossed on the sides thereof the following words: "Sheffield Farms Slawson Decker Co." The bottle was tightly sealed when received by the buyer and the caps were on very tight. The cap or paper hood which sealed the bottle, among other things, had printed on it the following: "Sheffield Farms Co. Inc. Bottled at Wilmarth Farms." These words were arrayed in the form of a circle, and in an inner circle on the paper hood were contained the following words: "Milk Commission of the Medical Society of the County of Kings." Also in circular form and further within the circle was the legend "Grade A Raw" and the word "Certified" in large letters in red ink, and in small letters under the word "Certified" appeared in smaller type the words, "Milk shipped from Kingsley, Pa.," followed on a single line by the word "Tuesday" in red ink. This bottle of milk was opened by the plaintiff's mother, who added to the milk boiled water, the milk so diluted to be used by the infant plaintiff as food. Toward evening, on the same day, the infant plaintiff became sick. An examination of the bottle by the plaintiff's father showed small worms attached to the inside of the glass bottle. The remainder of the milk was kept by the plaintiff's guardians and delivered to their family physician. The physician when called testified that the child had a temperature of 101, was vomiting, had a green stool, and had a distended abdomen; and the physician's diagnosis was gastrointeritis or inflamed condition of the stomach and intestines. The same doctor also testified that the inner surface of the bottle containing the milk was saturated with little organisms or worms, and that the nearest thing he could compare these organisms with were "dragon fly larvae." The doctor also testified that the presence of these organisms in the milk was a competent producing cause for the child's illness.

The doctor called by the defendant and who was authorized by the Kings County Medical Society to pass upon the milk produced at the Wilmarth Farms testified that, on one occasion, four years prior to the one in question, worms were present in the milk. The doctor indicated that these worms came from a reservoir used for the storage of water and that the worms had gotten into the reservoir from the surface, and that the water was used to wash the rims of the bottles and in that way the worms got into the bottle.

The complaint in the action proceeded upon the theory of negligence, alleging, among other things, that the illness of the infant was due to the carelessness, recklessness, and negligence on the part of the defendant in the preparation of said milk and without any negligence on the part of the infant plaintiff, or that of his guardian, contributing thereto. The complaint also contained an allegation that the milk was entirely unfit for human consumption and contained worms, and that these caused the infant plaintiff to become sick.

At the close of the testimony the plaintiff moved to amend the complaint to conform to the proof "and also to raise the question — proceed on the theory of implied warranty on the part of the defendant; that milk sold by the defendant to the plaintiff or any other consumer is warranted as being fit for human consumption." The court allowed this amendment.

The learned trial justice in rendering his decision on the case stated: "Upon the trial it was conceded that the defendant was guilty of no negligence. But the plaintiff claims on the theory that there was an implied warranty in the sale of the milk." According to the record, just quoted above, this was clearly a misapprehension, the plaintiff standing both on the action of negligence and also on that of implied war-

ranty. It thus appears that the court did not pass upon any alleged claim or cause of action for negligence.

It appears from the evidence that the milk in question was " certified milk," and that it was produced at the Wilmarth Farms, Kingsley, Penn. That the bottles and caps were furnished by the defendant, but that the actual bottling and sealing thereof was done at the Wilmarth Farms, and that no employees of the defendant were employed at the Wilmarth Farms, nor was any employee of the defendant engaged in the bottling process. The defendant corporation was a distributor of the milk.

The court below believing that there was but one cause of action, an implied warranty, before it for decision, rendered judgment in favor of the defendant. In making this decision the court relied upon certain expressions in the opinions in *Race* v. *Krum,* 222 N. Y. 410, 415; *Zenkel* v. *Oneïda County Creameries Co.,* 104 Misc. Rep. 251, 252; *Rosenbusch* v. *Ambrosia Milk Corp.,* 181 App. Div. 97, 100. The first two are cases resting on an implied warranty, and the third rested upon negligence alone.

The term " Certified Milk " is defined in section 32 of the Agricultural Law, which reads in part as follows: " No person shall sell, or exchange or offer or expose for sale or exchange, any unclean, impure, unhealthy, adulterated or unwholesome milk, or any cream from the same, * * *. No person shall sell or exchange, or offer or expose for sale or exchange, as and for certified milk, any milk which does not conform to the regulations prescribed by and bear the certification of a milk commission appointed by a county medical society organized under and chartered by the medical society of the state of New York and which has not been pronounced by such authority to

be free from antiseptics, added preservatives, and pathogenic bacteria, or bacteria in excessive numbers. All milk sold as certified milk shall be conspicuously marked with the name of the commission certifying it.''

The rules and regulations of the department of health, which are effective and have the force of ordinances in the city of New York, provide as follows: '' Certified Milk is milk certified by a Milk Commission appointed by the Medical Society of the County of New York, or the Medical Society of the County of Kings, as being produced under the supervision and in conformity with the requirements of that Commission as laid down for certifying, and sold under a permit therefor, issued by the Board of Health.''

It is also provided that '' The milk should be delivered to the consumer only in sealed bottles which have been sealed at the dairy.''

The bottle of milk in question was sealed in conformity with the standards of the Kings County Medical Society.

The case of *Rinaldi* v. *Mohican Company,* 225 N. Y. 70, construes section 96 of the Personal Property Law, which has reference to implied warranties of quality. Subdivision 1 of that section reads as follows: '' Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.''

In that case the court held that ''Article 5 of the Personal Property Law is not merely a codification of the existing rules regarding sales in this state. It

was the design as far as possible to make our law uniform with the legislation and laws on this subject existing throughout the country. To this end changes were made in what had previously been here the law. In section 96 itself, for instance, the distinction between the liability of sellers who were growers and manufacturers and others was ended. * * * Having in view the purpose of the article and the fact that in some states no implied warranty based on grounds other than those which affect every sale of a chattel was enforced, we have no doubt that section 96, expressed as it is in general terms, applies to all sales, including sales of food, and that any rules hitherto applied inconsistent with this section are abolished.

" In a sale of food, therefore, there is no longer an implied warranty of fitness unless the buyer expressly or by implication acquaints the seller with the purpose of the purchase and unless it appears that the buyer relies on the seller's skill or judgment. * * * The burden of showing that he has made known his purpose and that he has relied upon the seller is on him who claims the existence of an implied warranty. If either of these two facts do not appear he fails in his claim. * * *

" We think that the mere purchase by a customer from a retail dealer in foods of an article ordinarily used for human consumption does by implication make known to the vendor the purpose for which the article is required. Such a transaction standing by itself permits no contrary inferences. In this we agree with the courts of Massachusetts. (*Farrell* v. *Manhattan Market Company,* 198 Mass. 271–279.) But we think further that such a purchase, where the buyer may assume that the seller has the opportunity to examine the article sold, unexplained, is also conclusive evidence of reliance on the seller's skill or judgment."

Applying the foregoing to the facts at bar the mere purchase of the milk in this case by the buyer made known to the seller the purpose for which the article was required, namely, that of food. And from the facts disclosed the buyer might also assume that the seller had the opportunity to examine the milk. Any one reading the printed matter on the label might very well assume that the milk was the product of the defendant's farms. The fact that the milk was certified by the Kings County Medical Society as meeting the requirements of the statute and the regulations as to certified milk has not changed the situation. In *Rinaldi* v. *Mohican Company, supra,* the plaintiff bought a loin of pork at a market owned by the defendant. The meat was infested with trichinae, which are small worms. The pork had been inspected by officials of the United States government and bore a government stamp to the effect that the pork was sound and fit for consumption and free from defects, and the defendant in that case, as in this, strenuously insisted that the worms could not have been discovered on inspection. The fact that the milk in this case was certified by a medical society pursuant to the statute can have no greater effect than the inspection of the federal authorities of the meat in the *Rinaldi* case.

It is true that the Court of Appeals in *Rinaldi* v. *Mohican Company, supra,* stated that they did not pass upon the question as to whether the rule of law therein established applied to a sale in the original package bought from others.

Since the decision in *Rinaldi* v. *Mohican Company, supra,* the highest courts of other states have interpreted this same uniform Sales Act. In the case of *Ward* v. *Great Atlantic & Pacific Tea Company,* 231 Mass. 90, it appeared that the defendant conducted

a retail grocery store, and had for sale at this store beans in sealed all-tin cans, bearing this label: "Grandmother's Brand A & P Beans & Pork with Sauce, contents 2 lbs. 1 oz." "Remove contents of this can as soon as opened and place in earthenware dish." "The Great Atlantic & Pacific Tea Co., Incorporated, Distributors, Jersey City, N. J., U. S. A." The defendant in that action purchased the cans of beans from the Thomas Canning Company, of Grand Rapids, Mich., after canning, and the defendant furnished the labels, which were affixed to the cans by the manufacturer. The defendant had no supervision over the process of canning, and no knowledge or means of knowledge that any foreign substance was in the cans. Such cans are always sold to the public in a sealed condition. The Thomas Canning Company was an independent, reputable manufacturer of canned goods, and in its processes employed all modern methods to prevent the presence of foreign substances in its products. The defendant sold to the plaintiff, the buyer in that case, one of these sealed cans of beans. Among the beans was a small pebble, and the plaintiff in ignorance of the presence of the pebble and while eating of the beans broke his tooth on the pebble, and later, on account of the injury, was obliged to have his tooth extracted. The court in its decision cited the very same section, identical in phraseology, of the Sales Act as is relied on here. The court there held the defendant liable, and in its opinion states:

"The cans were sealed. Their contents could not in the nature of things be open to inspection before the sale. There could be no intelligent selection based upon any observation by the purchaser. There is no room for the exercise of individual sagacity in picking out a particular can. The customer at a

retail store. is ordinarily bound to rely upon the skill and experience of the seller in determining the kind of canned goods which he will purchase, unless he demands goods of a definite brand or trade name. The situation is quite different from the choice of a fowl or a piece of meat from a larger stock, all open to inspection, where there is opportunity for the exercise of an independent judgment by both the buyer and the seller, and where, therefore, the fact as to the one who makes the selection is of significance, as in *Farrell* v. *Manhattan Market Company,* 198 Mass. 271. The case at bar must be treated on the footing, as matter of necessary inference arising from the relation of the parties, so far as that is material in view of the other facts, that the plaintiff relied upon the knowledge and trade wisdom of the defendant in purchasing the can of beans. In the absence of an express statement to the contrary, this must be regarded as a necessary inference from the relation of parties.

" There appears to us to be no sound reason for engrafting an exception on the general rule, because the subject of the sale is canned goods, not open to the immediate inspection of the dealer, who is not the manufacturer, any more than of the buyer. It doubtless still remains true that the dealer is in a better position to know and ascertain the reliability and responsibility of the manufacturer than is the retail purchaser.   *   *   *   It places responsibility upon the party to the contract best able to protect himself against original wrong of this kind, and to recoup himself in case of loss, because he knows or comes in touch with the manufacturer."

The Massachusetts court then cites with approval *Frost* v. *Aylesbury Dairy Co., Limited,* (1905) 1 K. B. 608, which related to a sale of milk by a retail dealer. This case, as well as *Jackson* v. *Watson & Sons,* (1909)

2 K. B. 193, both arose under the English Sale of Goods Act, which does not differ in any particular material from the provisions of the Massachusetts and New York act. " Decisions of this character, in view of the fact that the English sale of goods act was enacted before our own, and of the close similarity of the pertinent section of each act, are entitled to consideration." See *McNicol's Case,* 215 Mass. 497, 499; *Wiedeman* v. *Keller,* 171 Ill. 93; and *Sloan* v. *Woolworth Co.,* 193 Ill. App. 620. See, also, cases cited in note, 5 A. L. R. 242, and in *Farrell* v. *Manhattan Market Company,* 15 L. R. A. (N. S.) 884.

Under the rules of law above referred to the defendant was liable on implied warranty, and what was said in *Race* v. *Krum,* 222 N. Y. 410, 415, can be said with equal propriety as to the reason for the result reached in this case; although in the case of *Race* v. *Krum* the defendant was the manufacturer of the ice cream and not merely the distributor as in the case at bar. In that case the court said: " The consequences to the consumer resulting from consumption of articles of food sold for immediate use may be so disastrous that an obligation is placed upon the seller to see to it, at his peril, that the articles sold are fit for the purpose for which they are intended. The rule is an onerous one but public policy as well as the public health demand such an obligation should be imposed."

The judgment appealed from is reversed and new trial ordered, with thirty dollars costs to appellant to abide the event.

CROPSEY, J., concurs; LAZANSKY, J., concurs in result.

Judgment reversed and new trial ordered, with thirty dollars costs to appellant to abide event.